Good morning. You may have to bear with us. This is my first involvement with a hybrid type hearing, so we'll see how we do. I'm fairly tech savvy, but this is a new one on me, so we'll progress. I have Attorney Kester for the appellant. You're in our upper right screen. And is it Ms. Citron? Am I saying that correctly? Yes, Your Honor. For appellee and Mr. Blonder, the appellee. Yes. Good morning, Your Honor. My understanding is appellees are going to split their time. And I think the clerk says she has the timer set up where it will let you know when your time is up. I will not notify you when your time is up. It will be up to you or the clerk to adjust your time accordingly. Mr. Kester, are you ready to proceed? Yes, sir, I am. All right. You may do so. Thank you. May it please the Court, Counsel, and Madam Clerk. Again, my name is Chris Kester, and my partner, Karen Wade, is with me in the room. Ms. Wade did a wonderful job preparing the briefs, and we are proud to represent J&J Ventures. J&J Ventures has been doing business in Eppingham and Central and Southern Illinois since 1929. I personally deposited many quarters in their jukeboxes and snack vending machines in 50 years, and now it's more of a national story, but, again, proud to represent them. Your Honor, again, because all the parties in this case, the attorneys, did a nice job briefing this, I'm going to focus my attention with regard to the oral argument on what I believe to be the 800-pound gorilla in the room with regard to the condition precedent analysis by the Board Administrator. The issues of fraud and due process are relied on the briefs. So, again, when we look at the heart of this case and why we're here, it's because the Board Administrator concluded that the contracts it issued were not valid because they were condition precedent contracts that were never executed. The IGB adopted the recommendations of the Board Administrator, and the Marion County Circuit Court affirmed. I think it's important, and I know, and I do not like to read the appellate court, and please bear with me. On page C658 of the record, the most important part of this entire case is this statement made by the Administrator, who, again, the recommendations were adopted. In exercising our exclusive jurisdiction here over the parties, the dueling agreements that seek to control placement of the operations of EGTs, we borrow from Illinois common law concerning contingent agreements and conditions precedent. Under Illinois law, it is well established that where a contract contains a condition precedent, the contract does not become enforceable or effective until the condition is performed. And then it goes on and cites a couple of cases in Illinois and talks about condition precedent. With the sincerest and utmost respect to the IGB's administrative team, who I completely understand that they were burdened with the Herculean task of formulating a comprehensive framework to create, regulate, and enforce matters after the Video Gaming Act was issued. And they had to do this from whole cloth with a completely blank canvas. So a completely Herculean task. But with regard to this one issue, respectfully, the IGB got it wrong. This is not a condition precedent contract. Now it's funny, the older I get, the more I realize what I don't know and how I have difficulty understanding certain concepts, especially when they're esoteric contractual concepts, without trying to simplify them and put them in more common terms real life scenarios. So when I first started looking at this, I thought, what's the difference between a common condition precedent contract and a normal contract that may be signed but perhaps not executed until later? And as a father and husband of three sons, I've seen far more college student leases than I care to ever see. And I've also seen a lot of life insurance policies. And those are the examples that I think makes it clear to someone like me. What I have learned, and hopefully my three kids have learned, is that college student leases are binding contracts the minute they sign them and binding contracts the minute their parents sign them. Even though when they sign those contracts, it's usually in the year preceding when they actually go to college. So I don't know, probably some folks in this room had kids go to undergrad at the University of Illinois. It's the craziest thing I've ever seen. They have to sign their contracts a year in advance, and they don't move in until the next September of the next year. But again, it's a situation where as soon as that contract is signed, it is binding. It's not contingent upon when the son moves in. My third son, God love him, he tested this theory. His other brothers went to U of I. He was going to go to U of I and then decided after signing a contract, a lease contract, he was going to go to Indiana University, which is a whole other problem. It had nothing to do with his girlfriend, he said. But he went to Indiana University after he signed a lease at the University of Illinois. And, of course, Dad signed it. I did not attempt to make the argument that because he did not move in, it was not enforceable. It was not binding. It was not a condition precedent. One hundred percent, we had to pay that contract, and fortunately we were able to find a sub lessee, and it was less painful. And probably the bigger point is that he did come to his senses the following year, went back to the University of Illinois, and all is right in the world. But, again, I think when I look at these use agreements that are at the very center of this controversy, that's exactly what we have here. The use agreements were signed by all of the parties, and notwithstanding the fact that the machines were not going to be placed in the establishments until certain events occurred, they were 100 percent enforceable. Now, let me give a real-life example to a condition precedent contract. And, frankly, it's a little difficult to define that because, as this Court is very well aware, somewhat like punitive damages, conditions precedent are not favored, those contracts. They're not implied. It has to be strict language in there. But what is a condition precedent contract? I mentioned life insurance with three kids and a wife. And I knew early on that I need as much term insurance as I could possibly afford. And I bought as much term life insurance as I could possibly afford. And it was very clear, even though I talked to my agent, we had all the documents signed, we crossed all the T's, we dotted all the I's, it was very clear that those life insurance policies were not enforced or enforceable or did not go into effect unless and until I handed them a check for the premium. So if everything was signed and on my way to the agent's office, I got hit by a bus with a check in my hand, my wife and kids would not have been entitled to any of those insurance proceeds, notwithstanding the fact that everything had been signed and sealed. That is a condition precedent contract. Mr. Kester? Yes, ma'am. I appreciate all of your family analogies, but you are operating under the common law when you talk about those contracts. The board here took the position that it didn't have to follow the common law. That's a very good point, and here's what I would say, and that's why I did something that I don't like to do, is to read to any court, especially the appellate court. I completely understand that the legislature adopted a comprehensive scheme, and the IGB can, pursuant to its own guidelines, including 320, can regulate and enforce these use agreements. However, in this particular case, when the IGB actually tells us in writing, we are borrowing from the common law and then misapplies it, I 100% believe that this court can fix it. For example, to make it even a better example, if instead we talked about this esoteric notion of condition precedents versus other contracts, if they said, we borrow from the common law, and we, after reviewing these cases that we've cited in our recommendations that were adopted by the board, we don't believe you need consideration for a contract as binding. Or the board says something like, all you need is an offer, you don't need an acceptance, you have a contract. That can be fixed, but I completely agree with what you just stated. But when they utilize the common law, borrow the common law, and do so incorrectly, I do not believe that the legislative scheme prevents courts like this from fixing it. And it's an easy fix. Assuming that we are talking about the common law and this condition precedent, the condition you're talking about was the licensing and first use of the terminal, correct? Is that what you're talking about in the contract? We certainly know that they had to be licensed. Both the TO and the establishment had to be licensed 100%. And when these contracts were signed, nobody was licensed. That is correct. That is correct. But they did comply with 320. And many of those other contracts which were in place today were also adopted. As 320 says now, first in line gets it. And, frankly, what the IGD has done is in the regulatory scheme, they have adopted that in the new 320. They said, yes, you can sign these agreements. And now what they've added is if it's not licensed or they don't go into effect within a year, they're void. But at the time, I think what I understand and what I believe the court can do and should do is they misapplied the contract law that they stated. And I will give credit to Mr. Bonder. In the mid-2000s, 2012 and 2013 and 2014, we went all over the state of Illinois and Mr. Bonder had his co-counsel there. And we called it the traveling road show. I had four big boards in the back of my vehicle with four easels. And I always set up the contracts. I set up the law. I set up 320. And not only are the Excel counsel very smart, but the trial judges, I think there were 17 of them, all indicated this is indeed an enforceable contract. Not a single judge suggested this is a condition precedent. The very wise and smart attorneys like Mr. Bonder didn't say it was a condition precedent. It's not enforceable because that is simply not the case. I'm trying to ask you what the condition precedent is that you're referencing. Is it the fact that the video gaming terminal had to be put in? That was the condition? That's what the court said. Because we didn't have our machines in these establishments, that that indeed, yes, was a condition precedent. I'm sorry, Justice, if I didn't follow you. Okay. Exactly. So why isn't that a condition precedent? Nobody was licensed when these were entered into. The Video Gaming Act was just coming out. It seemed like everybody was trying to get the first contract signed that they could. There was no consideration that I could see given for the contract. And they were contingent upon, in other words, it wouldn't go into effect until the first video gaming device, VGT terminal, was placed and operational in the establishment. And, Justice, I do hope I understand your point. Why isn't that a condition precedent? Because I don't think, especially at the beginning, that would be the chicken and the egg. I mean, there's no way we could have had that. There's certainly an appropriate time when the term starts, like my son's lease. We're going to sign it in December, but the 12-month term is going to start when he moves in on August 28th. That's when the term starts. That is not a condition precedent, and that does not mean that we don't have a 100% enforceable contract when we signed it in December. And, again, I think if you look at the new and improved 320 regulation, it really adopts the first-in-time analysis. And then it added, oh, by the way, if we haven't started our term within the year, then they're void. But, again, the IGB understands that you can't have the cart before the horse, and we have the chicken and egg, and these agreements are enforceable, and they're necessary. And let's see, I'm running out of time. I want to thank you, Justices, and I will answer any questions now or run rebuttal. Is there a disagreement about the standard of review or to apply here? I believe that the interpretation of a contract is de novo. So I think, now they're suggesting it's a mixed question of law and fact. It's a clearly erroneous standard. I think it's de novo, but the application of the condition proceeding analysis is clearly erroneous under the circumstances, and it can and should be fixed. Thank you. Thank you. Mr. Blonder, are you going next? I am, Your Honor. Thank you. Are you ready to proceed? I am.  All right. You may proceed when you're ready. May it please the Court. My name is Stephen Blonder, and I represent Accel. There's a couple of issues I want to flag just for this Court, and I remember being in the courtroom live arguing the case that became J&J Ventures v. Wild in the Supreme Court, where this Court wisely said issues of the determination of a use agreement and its validity, and by the way, it involves some of the same contracts we're talking about today, were best left to the gaming board, but the courts didn't have jurisdiction on that. So it's almost deja vu. We're back again now that the gaming board has ruled on the issue. The gaming board is unequivocal, and Mr. Kester even admitted it in his response to the questions, that to have a valid use agreement, you need a licensed terminal operator and a licensed establishment. The contracts here at issue were never signed by a licensed terminal operator. They were signed by Action Amusement, assigned to Action Gaming, whose license application was denied. While an appeal of that was pending, they purported to assign it to J&J. So the real issue that was facing the gaming board is whether a non-licensed entity, in fact a denied licensed entity, could participate in gaming revenues, when those contracts were illegal as a matter of law. Contracts for gaming were illegal unless they specifically fit in the purview of the Illinois Gaming Act. Again, common law, the contracts are illegal. They're void. You have no right to participate in them. When you say they're illegal, you mean they're criminal? It could be criminal. There's no common law right to gaming. It's illegal, and the legislature made a narrow exception with the Video Gaming Act and provided that certain types of video gaming would be permitted. And if the contract doesn't specifically apply and comply with those requirements, it's an illegal agreement. And it could be criminal, yes. One of the things that the board — I didn't mention frayed gaming and other things. I'm sorry, Justice. I know it's difficult. One of the things that the board did not do is discuss the terms of the agreement and whether it complied with Rule 320. Correct. They didn't get there. They didn't need to. Why? Because they knew that this was an unlicensed applicant. They knew that action gaming had been denied. The gaming board is the one that denied that years ago. So that's the backdrop that the gaming board is acting within with the full knowledge of the status that action gaming was never licensed as a terminal operator. Well, I'm a little concerned about the fact that the rule changed such that if this case would have been brought under the new rule, your client would have lost. Not necessarily. Why not? Because, again, action gaming was never licensed. And under the agreement that they're trying — the issue that the gaming board never got to in this case was whether or not the unlicensed and denied applicant could in any way participate in revenues from the agreement. That was an issue that was flagged, and that goes to the action gaming role. And the board has unequivocally always said no to that. So that's not a concern here, number one. Number two, the rule that this was brought under was not the new rule. Rules can change at different points in time. And so we look at it under the rule that it was brought under. And at that point in time, that was not the rule. But why did the rule change? The rule subsequently — Yeah, why did the rule change? It seems to me that the rule changed because they adopted the common law interpretation of contracts. No, the rule changed because they wanted to provide some clarity and provide a bright-line test at some point in time, which was the decision of the gaming board. But, again, that wasn't the law in effect at the time these contracts were entered into and under which petitions were filed. So laws can change from time to time. Court cases can change from time to time in terms of the application of the law. But we look at the law at the time that it was in place. And here, what the gaming board said, and I refer in the record to page C-3041, they note that the jurisprudence of contract law is not binding on the proceeding and that the administrator simply looked at the common law as a general guide in making its determination whether the agreements were valid or enforceable. The administrator and, in fact, the gaming board was not trying to interpret the common law, was not trying to define the common law the way a trial court would, an appellate court would review, and a Supreme Court might take a PLA after that. It was simply looking to say, what's the applicability of rules with respect to contracts, and how do we take what we learn from that and make our decision under the Video Gaming Act as to which contract would be in place? And, again, the issue comes back to the long-held view of the gaming board that the only appropriate agreements under the Video Gaming Act are those between licensed operators and licensed establishments, which takes the whole issue out of the equation. What essentially J&J has tried to do here is grasp onto the wild, wild west and then claim some rights. And now what they do, the gaming board, the administrator rules against them. They provide exceptions on saying, oh, well, Excel must have engaged in fraud to do this, and then complain about that fraud as being a way to undercut the administrator's decision. That doesn't work because they never raised the fraud until after the administrator had ruled, had given his rules. And you can't just raise an exception and ask, well, somehow give it effect, give it apply. They waived that argument by not developing it. Here, again, circling back, as a court, we give deference to the administrative agency's interpretation of its own rules, of the statute that's charged with administering, and with respect to the standard of review to the Justice's last question, Mr. Custer, we absolutely disagree that this is de novo. We believe that we succeed under any standard. However, it needs to be clearly erroneous because this is a mixed question of law and fact in terms of the application of that agreement. If the court has no further questions, I'll defer the rest of my time to Ms. Citrin. No questions. I now present Ms. Citrin. Good morning, Your Honors. Counsel, may it please the court. Assistant Attorney General Chaya Citrin on behalf of the Illinois Gaming Board. This court should uphold the board's final order ruling that J&J's use agreements with the contested locations were not enforceable over Assal's agreements with the same locations. I'm going to focus, as other counsels today have, on whether the order here was clearly erroneous and if the court has any questions about the allegations of fraud or about the lack of discovery or an in-person hearing, I'm happy to entertain those questions too. The board's order here was not clearly erroneous because the board reasonably exercised its administrative expertise when it concluded that Assal, which was first to operate terminals in the contested locations, had the enforceable use agreements with those locations. By ruling that each agreement here was to become enforceable when the operator first operated a terminal at the location, the board gave effect to the agreement's terms about the event that would trigger the parties' obligations. J&J's agreements stated that the term would commence on the date that the first terminal would first operate in the establishment, and the agreement stated that it would be exclusive during the term of the agreement. Likewise, Assal's agreement provided that the term was contingent on when the terminal would begin operating. Given the agreement's language, the board reasonably concluded that Assal's use agreements were enforceable because Assal, unlike J&J, had installed terminals in each contested location. Here, the board, as Mr. Blonder pointed out, was not applying the common law of contracts. It made very clear in its final board order that it was looking to the common law of contracts as guidance, but that the common law of contracts was not binding. Had the board wanted to adopt the entirety of the common law of contracts, it could have done so, but it was not required to do so, and it did not do so here. And it's very clear that it was not required to do so because if the common law of contracts was the end-all and be-all when it comes to interpreting use agreements, the Illinois Supreme Court would not have held in J&J Ventures 1 that the board, as opposed to the circuit courts, have exclusive authority to determine whether a use agreement is valid and enforceable. So whether the board misapplied or correctly applied the common law of contracts is irrelevant in this case. Ms. Zitron, what about Mr. Kester's argument that the language at C658 uses the words common law? Right, so that was in the administrator's recommended decision. The final board order is what's at issue now. That's what this court is reviewing, and in the final board order, the board made very clear that it was not bound by the common law of contracts and that it was simply looking to the common law as guidance, but that it was not considering bound by it. So whether the board correctly applied the common law of contracts or misapplied it is irrelevant because it did not view the common law of contracts as binding. And that was reasonable for the board to do. It looked to the language of the agreements here. It tried to reasonably interpret them. It's not an expert in contract law. That's not what the board is supposed to be an expert in. And it tried to come to the best resolution that it could, and its decision was consistent with the purpose of the Gaming Act, which is to spur economic development and to provide revenue for the state. And that's what the board did here. So had the board ruled that currently operational use agreements were invalid or were unenforceable, that would have caused mayhem in the state. It would have interrupted the generation of revenue for the state because it would have required removing machines that had been terminals that had been operating for years. And given that fact and the fact that there had been this turmoil for several years following the enactment of the Video Gaming Act, it was understandable for the board to look at the facts on the ground and to look at the terms of the agreements themselves and to say, here the parties said that their agreements were going to become, were going to go into effect when they actually installed terminals and they would be exclusive during that period. Here one of these parties actually installed their terminals and one did not, and so we find enforceable the one that installed their terminals. And it makes sense that going forward after the board issued its decision in this case in 2021 that it amended Rule 320 to clarify that going forward, we're now going to give all the participants in this industry very clear notice of how this process is going to work going forward. Now going forward, if you're an unlicensed location, you enter into a use agreement and you become licensed. If you enter into a second agreement, the first agreement is the one that's going to be binding. It's going to be enforceable. And that made sense for the board to do. There had been a lot of litigation about these conflicting competing use agreements, and now the board said we need to give guidance that going forward, this is the rule. But before that rule was enacted, it made sense for the board to look at the agreements the parties had entered into, to look at the purpose of the Video Gaming Act and to say here's an agreement that's enforceable. That's that. Ms. Zitromny, the new rule, would it have allowed the same kind of contract that was entered into in this case? Do you mean would J&J's agreement be enforceable? Yes. Because it was assigned from an unlicensed operator? Yes. Had a video terminal been installed, would the contract have been enforceable if performed within a year? So in this case, the board has not addressed that particular question about the validity of an assignment from an unlicensed prospective operator to a licensed operator. And I can't speak to how the board would answer that question because I don't believe that the board has answered that question in a different case either. So I really, unfortunately, I can't speak to that particular question. So I don't know how they would resolve that dispute if it were to arise. So you think the assignment is a critical issue here? I don't think it's critical. The board did not rely on it. The board simply looked at the terms of the agreements and said here, if J&J's assignment were valid, assuming it is, because J&J did not install their terminals first, their agreement is not enforceable over Estelle's agreement. And that's what I'm basically asking is would J&J's agreement be effective under the new rule? It says it would. Oh, go ahead, Yaron. It says it would be effective under the new rule. Potentially it could be effective. I don't think the board has explicitly addressed the question of the assignability of agreements between an unlicensed operator and a licensed operator. There have been agreements that J&J has entered into that I think are identical where the board has allowed those agreements to go forward, and that J&J did operate under those. So potentially that could be enforceable. I don't know that the board has explicitly addressed the question of the assignability, though. Well, I'm trying to exclude the assignability because J&J says they've entered into these contracts since the new rule and they're enforceable. So I'm trying to figure out what's the difference between what happened before and the new rule? What did the board do differently that caused this new rule to come into play? I think the board realized that there had been a lot of confusion and there had been a lot of upheaval, and they wanted to make a rule going forward that was going to be very clear. But because there had been no such rule previously, they needed to look to the agreements language, and they made a reasonable judgment call based on the agreements language and said in this case because of the agreements language and because of the purpose of the Gaming Act, which is to further video gaming and the generation of revenue, we're going to find enforceable the agreements that are already being operated under. I'm not saying that it's impossible. It would have been impossible for the board to have come to a different conclusion. I'm saying this was a reasonable interpretation here, and that is not a clearly erroneous exercise of the board's discretion in this case. Unless the court has any further questions, I see that my time is up. So I respectfully request that this court affirm the Circuit Court's judgment, thereby upholding the board's final administrative order. Thank you. Questions? No questions. All right, thank you. Mr. Custer, rebuttal? Thank you, Justice. This is very brief, and notwithstanding the fact that I'm getting ready to disagree with Ms. Citrin and Mr. Blonder, I do not retract my comments that they're really, really good counsel. I do want to correct this. When the court asked Ms. Citrin about the inaccurate recitation of the common law and borrowing from the common law, I think the response was I could be wrong. It was that the board didn't rely upon it. I must respectfully disagree and specifically cite to the record of C-3041, where under the conclusions of the law, in the final board order, it says, and I quote, contract law serves as guidance to the board in resolving Rule 320 disputes. So without question and through nothing intentional, it happens, they got this wrong. Just as if they would have said the law says that the world is flat. We could be here, and you can fix it. When Mr. Blonder and I were here before you in 2015, you didn't have the opportunity at that time to weigh in on this because it was a jurisdiction issue. Now the process is working. You can fix it, and you can make it right. And the question is why did the rule change? Of course it has. They've adopted this. They saw the error of their ways, and the new 320 works. I also want to point out that at the time these agreements were all signed, including Mr. Blonder's clients, no one was licensed. No one was licensed, and they were being forced all the time. What we were trying to avoid, what the IGE was trying to avoid, what everyone was trying to avoid is really the condition preceding, and this is not a condition of freezing contact, but was when do you get the games in? Are we going to have a rush into the police there? Well, my games are here first, and I'm in the parking lot. That's why the very video gaming act, section 4025C, says that before you can place games, you have to have a use agreement. You have to have a use agreement. We had use agreements. They were enforced. They are enforced. And I don't know that this was very clear. I thought perhaps someone was trying to suggest that action, the person who assigned these contracts to us, had already been denied. That's not true. I assume everyone agrees with that. At the time, the valid enforceable contract was entry binding between Action and J&J. Action had not been denied. So I want to make that very clear. So, again, kudos to the gaming board for doing this Herculean task. We're all human. We make mistakes. A mistake was made. That's why we have this process. It's the best legal system on the planet. It's not perfect. And you can fix it. I appreciate everyone's time, and thank you for your patience. Thank you. Questions? No questions. Just kidding. Thank you. I appreciate your arguments. It's an interesting question, and facts and information to me. But we'll take the matter under advisement and issue a decision in due course.